UNITED STATES of America, Appellee,

v.

Edward O'GRADY, Defendant-Appellant.

No. 782, Docket 82–1344.

United States Court of Appeals,
Second Circuit.

Submitted Oct. 12, 1983.

Decided July 12, 1984.

Pierce, Circuit Judge, filed concurring opinion in which Feinberg, Chief Judge, and Irving R. Kaufman, Kearse, and Cardamone, Circuit Judges, joined.

Jon O. Newman, Circuit Judge, filed concurring opinion in which Winter and George C. Pratt, Circuit Judges, joined.

Van Graafeiland, Circuit Judge, filed opinion concurring in part and dissenting in part.

Mansfield, Circuit Judge, filed dissenting opinion in which Lumbard, Circuit Judge, joined.

Barry M. Fallick, Rochman, Platzer & Fallick, New York City, for defendant-appellant.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Ronald E. DePetris, Chief Asst. U.S. Atty., L. Kevin Sheridan, Michael H. Gold, Asst. U.S. Attys., Brooklyn, N.Y., for appellee.

Before FEINBERG, Chief Judge, and LUMBARD, KAUFMAN, MANSFIELD, OAKES, VAN GRAAFEILAND, MESKILL, NEWMAN, KEARSE, CARDAMONE, PIERCE, WINTER and PRATT, Circuit Judges.

### ON REHEARING EN BANC

MESKILL, Circuit Judge, joined by FEINBERG, Chief Judge, IRVING R. KAUFMAN, OAKES, JON O. NEWMAN, KEARSE, CARDAMONE, PIERCE, WINTER and GEORGE C. PRATT, Circuit Judges.

This is an appeal from a judgment entered in the United States District Court for the Eastern District of New York, Platt, *J.*, convicting appellant after a jury trial of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982). A divided panel of this Court affirmed the conviction of O'Grady on August 10, 1983. At the request of a member of this Court, a poll of the judges in regular active service was taken to determine if the case should be reheard *en banc*. A majority voted for the rehearing. The Court called for and received new briefs from the parties which addressed the issues discussed in the majority and dissenting opinions. Sitting *en banc*, we now vacate the panel opinion, reverse the conviction and remand to the district court for a new trial, because there was plain error in the charge given to the jury.

### BACKGROUND

In 1972 the New York City Transit Authority (NYCTA) executed a contract with Pullman Standard under which NYCTA agreed to purchase from Pullman Standard 745 subway cars at a cost of nearly $210 million.[1] Edward O'Grady was employed by the NYCTA as superintendent of the Quality Control Section, Department of New Car Engineering. In 1981 a federal grand jury indicted O'Grady for violating the Hobbs Act by accepting an assortment of benefits from companies under contract to provide subway cars to the NYCTA. O'Grady was tried by a jury, found guilty and sentenced to one year probation plus a $10,000 fine.

The Hobbs Act proscribes extortion affecting interstate commerce, whether by "wrongful use of actual or threatened force, violence, or fear, or under color of official right." [2] 18 U.S.C. § 1951(b)(2) (1982). The Act is a powerful and effective

---

1. NYCTA's purchase of the subway cars was financed in substantial part through funds administered by the Urban Mass Transit Authority, United States Department of Transportation.

Delivery of the cars began in March 1975 and was completed in October 1978.

2. The Hobbs Act provides that:

law enforcement tool, providing for up to twenty years imprisonment, a $10,000 fine, or both. It has become a principal weapon in the government's arsenal against corruption in public affairs.

In *United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), this Court held that extortion "under color of official right" occurs "when a public official makes wrongful use of his office," whether or not "the wrongful use of official power [is] accompanied by actual or threatened force, violence, or fear." *Id.* at 130–31. We are now asked to decide whether extortion under color of official right occurs when a public official merely accepts unsolicited benefits knowing that they were given because of his public office. We hold that it does not.

O'Grady had been involved in the contract negotiations and the ultimate selection of Pullman-Standard as the prime contractor for the purchase of the subway cars. Pullman-Standard engaged numerous subcontractors to help design, manufacture and assemble the new subway cars

for what was commonly known as the R–46 project. Throughout the project, O'Grady was responsible for ensuring vendor compliance with contract specifications. Before any component of the new subway cars was put into full production, it had to be inspected and approved by O'Grady's department. If a component was defective from either a technical or aesthetic viewpoint, or failed to comply with contract specifications, O'Grady could force the vendor to make the necessary modifications at its own cost. The inspection process continued from the design stage through final production.

O'Grady's indictment charged him with "attempting to obtain and obtaining the benefits valued at approximately Thirty Thousand Dollars ($30,000) in entertainment, including but not limited to lunches, dinners, sports events, golf outings, weekend vacations and trips, from [vendors involved in the R–46 project], with the consent for such entertainment having been wrongfully induced under color of official right."[3] *See* App. for Appellant at 8. At

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—
(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia

and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.
(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.
18 U.S.C. § 1951 (1982).

**3.** Count One of the indictment alleged:
1. In or about and between January 1, 1972 and June, 1981, both dates being approximate and inclusive, the defendant EDWARD H. O'GRADY knowingly, wilfully and unlawfully did attempt to and did obstruct, delay and affect commerce, as that term is defined in Section 1951(b)(3) of Title [18] of the United States Code, by attempting to obtain and obtaining the benefits valued at approximately Thirty Thousand Dollars ($30,000) in entertainment, including but not limited to lunches, dinners, sports events, golf outings, weekend vacations and trips, from Pullman, Rockwell, General Electric, Luminator, WABCO, Walton Products, Westcode, Standard Steel, Elicon National, New York Air Brake Co., McGraw Edison Co. and Abex Inc., their officers, agents and employees, with the consent for such entertainment having been

trial, the government proved that during the nine year period covered by the indictment, O'Grady received from Pullman-Standard and its subcontractors over forty fully paid trips to various resorts throughout the country,[4] two "all events" season tickets to Madison Square Garden, countless rounds of free golf, meals and other benefits, altogether worth in excess of $34,-000. O'Grady willingly accepted all of these benefits despite having instructed his subordinates not to accept anything from R–46 contract vendors.

O'Grady admitted having received the benefits, but he denied wrongdoing. He maintained that entertaining customers was an industry wide practice and that he was only one of many NYCTA officials who had received benefits from R–46 vendors. The evidence adduced at trial supported O'Grady's contention. Several R–46 contract vendors testified that it was company policy to entertain customers and that many NYCTA officials, including O'Grady's supervisors, had also been treated to meals, entertainment and trips.[5] From the vendor's perspective, the expense of entertaining customers was offset by the positive customer-vendor relationship and goodwill that it purchased. Moreover, the vendors could in most cases deduct for tax purposes the cost of the entertainment as an ordinary and necessary business expense.

O'Grady held the reins on the production process and he would often supervise on-site inspections himself. Vendors treated O'Grady, who was known to be an avid golfer, to countless rounds of golf in conjunction with his on-site inspection tours. Although most vendors considered O'Grady a fair man, "[h]e was a tough man when it came to enforcing the rights of the [NYCTA]."[6] Evidently it was difficult to sit down and do business with O'Grady as he was a very busy man. Vendors viewed the meals, trips and other entertainment conferred on O'Grady as a way to get his ear. There is no evidence in the record that O'Grady ever demanded or asked for a free meal, an expense-paid trip or a complimentary round of golf. The benefits he received were freely and willingly offered by the vendors. In the words of Pullman-Standard's project manager, "[i]t was our normal way of doing business." Trial Tr. at 187.

■ The trial judge instructed the jury that extortion under color of official right requires proof that (1) the defendant obtained property of another with his consent; (2) the consent was induced under color of official right; (3) the defendant knowingly and willfully obtained the prop-

wrongfully induced under color of official right.
2. The aforesaid conduct of the defendant EDWARD H. O'GRADY had the potential of affecting and did affect commerce (a) because it depleted the assets of the above-named companies, all of which were engaged in, dependent upon, and regularly used the facilities of interstate commerce; and (b) because the performance of the R–46 contract, described in paragraph 2 of the Introduction of this indictment, required the use of the facilities of interstate commerce for the movement of materials, supplies, products and personnel between New York and other states. (Title 18, United States Code, Section 1951).
See App. for Appellant at 8–9.

4. The overwhelming majority of trips were two-to-four day excursions to various resorts, principally the Greenbrier in White Sulphur Springs, West Virginia. The vendor would typically pay for O'Grady's, and sometimes his wife's, food and lodging and would often pay the travel expenses. The vendor paid for O'Grady's golf expenses on each trip. The pattern of excursions indicates that O'Grady travelled most often at vendors' expense when activity on the R–46 contract was greatest.

5. See, e.g., Trial Tr. at 59–60 (testimony of Walter Kilrae, ex-Assistant Program Manager of the R–46 project, Pullman-Standard); 277, 386 (testimony of Martin Simon, ex-engineer, General Electric Co.); 411 (testimony of Jay Hook, Vice-President, Masco Corp.); 469–70 (testimony of Alfred W. Frank, Director of Sales, McGraw-Edison Co.); 566, 574 (testimony of Robert W. Kennedy, ex-Project Manager of R–46 project, Union Switch & Signal Co.); 948 (testimony of P.O. Willaman, President, New York Air Brake).

6. Trial Tr. at 185 (testimony of Walter Kilrae); see, e.g., id. at 949–50 (testimony of P.O. Willaman); 1003 (testimony of Frank F. Frangella, Foreman, NYCTA); 1016 (testimony of William Gregory, Foreman, NYCTA).

erty by those means; and (4) the defendant's actions in obtaining the property affected interstate commerce. O'Grady disputed only two elements. He denied having induced the benefits he received and having known the benefits were given to him because of his public office. He defended on the basis that the indictment merely described normal business practice. The district court instructed the jury:

> If you find beyond a reasonable doubt that a company gave any benefit that it is alleged to have given in the indictment because the company reasonably believed that, in his official capacity, Mr. O'Grady had the power to take or withhold action that could hurt or benefit the company, or to affect or influence the inspection and delivery of the R–46 subway car, then you may find that the consent of the bestowing company was induced under color of official right, and if you further find beyond a reasonable doubt that the defendant knew that that [was] the reason travel and entertainment benefits were given to him, then the second element is satisfied; but if either or both of these facts has not been so proven beyond a reasonable doubt, then it is not, and you must find for the defendant.

Trial Tr. at 1785–86. The district court explained that "[t]he Government need not show that the defendant in words or otherwise, induced, requested, demanded, or solicited the benefits," *id.* at 1784, or that O'Grady "was influenced in his decisions by any favor he received," *id.* at 1783.

O'Grady's attorney forcefully objected to the charge delivered by the district court[7] and offered his opinion that under the charge given, "President Reagan and Mrs. Reagan must be convicted, absolutely must," as must any "public official, who takes a cigarette or a cigar from anybody else." *Id.* at 1818–19. The jury returned a verdict of guilty and the district court thereafter sentenced O'Grady to a one year term of probation and a $10,000 fine. This appeal followed.

## DISCUSSION

O'Grady argues that his conduct did not constitute extortion under color of official right. He urges the abandonment of precedent in this Circuit interpreting the Hobbs Act broadly, *see United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Trotta*, 525 F.2d 1096 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), in favor of a narrower reading that would limit the Act's scope to extortion accompanied by some form of duress. Relying heavily on the dissent of Judge Aldisert in *United States v. Cerilli*, 603 F.2d 415 (3d Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980) (citing *United States v. Mazzei*, 521 F.2d 639 (3d Cir.) (en banc) (Gibbons, *J.*, dissenting), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975)), O'Grady argues that Congress intended to rely on

---

7. The district court's jury instruction incorporated the government's request to charge with minor modifications in favor of the defendant. O'Grady's attorney filed objections to the government's proposed instructions, but he failed to object when the district court went over the charge it intended to deliver to the jury.

After the district court charged the jury, O'Grady's attorney objected on the record to the entire charge as wrong on the law. Because O'Grady's attorney filed objections to the government's proposed instruction and because it was clear throughout the trial that O'Grady disputed the government's interpretation of the law, we find that O'Grady sufficiently preserved his right of appeal on this issue.

In his brief to the three judge panel, O'Grady framed the "sole question on appeal in this case [as] whether [his] conduct is cognizable as extortion under the terms of the Hobbs Act." Br. of Appellant at 6. Thus, his appeal was not limited to a challenge of the sufficiency of the evidence, but directly attacked the district court's instruction on the law. In O'Grady's words, "where extortion under color of official right is charged, the government must prove that the payment was obtained by force, fear or duress." *Id.* at 7. In his brief to the *en banc* court, O'Grady presents and argues the question of "whether the district court erred in failing to instruct the jury that it could convict only if O'Grady wrongfully used his public office to induce the benefits received."

The jury charge contained plain error in any event.

the New York law of extortion to define the crime under the Hobbs Act. Under New York law, extortion under color of official right required the unlawful seizure of personal property, the receipt of an unauthorized fee by misrepresentation or the official's use of force or fear. *Cerilli,* 603 F.2d at 433 (Aldisert, *J.,* dissenting). O'Grady claims that *United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), deviated from the congressional intent when it stated that extortion did not require force, threats or use of fear. We found these arguments unpersuasive in *United States v. Margiotta,* 688 F.2d at 130–31, and see no reason to overrule that decision.

■ Having rejected O'Grady's broad arguments, however, we nonetheless hold that the district court erroneously instructed the jury that the mere acceptance of benefits by a public official is extortion under color of official right if the official knew that his office was the motivation behind the giving of the benefits. "Extortion 'under color of official right' is committed when a public official *makes wrongful use of his office to obtain money* not due him or his office." *United States v. Margiotta,* 688 F.2d 108, 130 (2d Cir.1982) (emphasis added), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). The conduct proscribed by the Hobbs Act is the wrongful use of public office, not merely the acceptance of benefits. Although receipt of benefits by a public official is a necessary element of the crime, there must also be proof that the public official did something, under color of his public office, to cause the giving of benefits.

Extortion under color of official right was added to the federal criminal law in the 1940s to combat racketeering in interstate commerce. Anti-Racketeering Act of 1946, Pub.L. No. 79–486, § 1(c), 60 Stat. 420 (1946) (amending the Anti-Racketeering Act of 1934, Pub.L. No. 73–376, 48 Stat. 979 (1934)). *See United States v. Cerilli,* 603 F.2d at 431 (Aldisert, *J.,* dissenting) (quoting *United States v. Local 807 of*

*International Brotherhood of Teamsters,* 315 U.S. 521, 529, 62 S.Ct. 642, 645, 86 L.Ed. 1004 (1942)). The federal courts have converted the crime from a narrow prohibition aimed at public officials who demand or receive a fee not due them or their office, or who extort money by force or violence, into a broad license for "federal authorities to police influence peddling in the political processes of the states." *United States v. Mazzei,* 521 F.2d at 652 (Gibbons, *J.,* dissenting); *see* Ruff, Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy, 65 Geo.L.J. 1171, 1183 (1977).

The practical effect of the district court's instruction is to further extend the reach of the statute and to impose upon all public officials an affirmative obligation not to accept benefits of any type or form. The statute is thus transformed from a vehicle to eradicate extortion and robbery in interstate commerce into a professional ethics standard governing public officials.

The instruction of the district court does not square with this Court's decision in *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). In *Margiotta,* this Court examined the government's burden of proof in a Hobbs Act prosecution for extortion under color of official right. Joseph Margiotta was Chairman of the Republican Committee of Nassau County and the Town of Hempstead, New York. Although not an elected official, Margiotta wielded considerable control over certain public officials and governmental functions in those municipalities. Margiotta had negotiated a deal with the Williams Agency, an insurance broker, under which he agreed to appoint the Agency as Broker of Record with full power to place insurance on all municipal properties in exchange for the Agency's promise to designate fifty percent of its insurance commissions to be distributed at Margiotta's direction to others as political favors. Margiotta was indicted for, among other things, "violating the Hobbs Act by inducing the Williams Agency to make the

payments of the insurance commissions under color of official right." *Id.* at 114. Margiotta defended, unsuccessfully, on the ground that his appointment of the Williams Agency as Broker of Record was not contingent upon a secret agreement to divvy insurance commissions, and that "commission sharing among brokers was a good faith continuation of a long-standing and widely-known political patronage arrangement in New York." *Id.* at 119.

Margiotta's conviction was affirmed on appeal. Writing for this Court, Judge Kaufman held that "[a]ffirmative pressure in the form of force, fear, or direct solicitation" is not necessary to establish inducement because the power inherent in public office supplies the necessary pressure or threat. *Id.* at 132. Instead, "it is the utilization of the power of public office to induce consent to the payments that is the gist of an offense of obtaining money 'under color of official right.'" *Id.* The evidence established that the Williams Agency consented to the kickback arrangement only because Margiotta would have, as he testified, replaced it as Broker of Record had it not consented. Consequently, there was sufficient evidence to support a finding that "power of office [was used] in such a manner that would induce the payments." *Id.* at 133. Thus, Margiotta was guilty of violating the Hobbs Act not because he was powerful but because he used the power of public office to induce payments not due him or his office.

The district court's charge to the jury in this case permitted the jury to find O'Grady guilty of extortion under color of official right absent any proof that he wrongfully used his office to *induce* the benefits he received. Essentially, the district court equated the mere acceptance of benefits by a public official with wrongful use of public office and permitted the jury to infer inducement if it found that the R–46 vendors bestowed benefits on O'Grady because of his public office and that O'Grady knew

what motivated the bestowal. The district court instructed the jury:

> The Government need not show that the defendant in words or otherwise, induced, requested, demanded, or solicited the benefits from the companies involved.
>
> So long as the motivation for the bestowal of any of the benefits focused on Mr. O'Grady's office—that is, so long as the office or the fact of his official position, induced the payments—and so long as the defendant knew such was the case—then the conduct falls within the ambit of the Statute.

Trial Tr. at 1784.

As *Margiotta* made clear, to prove the crime of extortion under color of public office the government must show that the public official *induced* the benefits received.[8] The fact of public office supplies the potential threat or force necessary, but it is the wrongful use of that office to induce benefits that constitutes the crime. The charge given by the district court eliminated the government's burden of proving that O'Grady used his office to induce or obtain the benefits he received. Judge Kaufman's opinion in *United States v. Margiotta* is replete with references to this indispensable element of the crime: "[e]xtortion 'under color of official right' is committed when a public official makes wrongful use of his office to obtain money not due him or his office," 688 F.2d at 130; "it is the utilization of the power of public office to induce consent to the payments that is the gist of [the] offense," *id.* at 132; "a public official may be guilty ... if the payments are motivated as a result of his exercise of the powers of his public office," *id.* at 133; and, public officials are guilty if they "use their power of office in such a manner that would induce the payments," *id.*

While the government is not required to prove that the public official demanded or directly solicited the benefits

---

**8.** "Induce" means "to move and lead (as by persuasion or influence)" and "obtain" means "to gain or attain possession ... by some planned action or method." Webster's Third New International Dictionary (1971).

received, or that he offered a specific *quid pro quo* in exchange for the benefits, *United States v. Trotta,* 525 F.2d 1096, 1100 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), the government must show that the power of public office was misused in such a way as to induce the giving of benefits. *Cf. United States v. Dozier,* 672 F.2d 531, 537 (5th Cir.) ("the prohibited exchange is the same: a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act"), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *United States v. Trotta,* 525 F.2d at 1100 ("the pressure exerted by Trotta by means of the power of his public office to induce the payment of money is, in itself, the misuse of the office"); *United States v. Mazzei,* 521 F.2d 639, 643 (3d Cir.) (en banc) (jury could conclude that extortion under color of official right occurred "so long as it found that [the extorted party] held, and defendant exploited, a reasonable belief that . . . the power in fact of defendant's office included . . . effective authority"), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

We recognize that several other courts of appeals have explicitly rejected the notion that proof of inducement is necessary. *See, e.g., United States v. Jannotti,* 673 F.2d 578, 595 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Hedman,* 630 F.2d 1184, 1195 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Butler,* 618 F.2d 411, 417–18 (6th Cir.), *cert. denied,* 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980); *United States v. Price,* 617 F.2d 455, 458 (7th Cir.1979); *United States v. Braasch,* 505 F.2d 139, 151 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). However, we do not read those decisions to permit a conviction for extortion under color of official right absent evidence that the public official misused his office to obtain the benefits. Certainly the facts of those cases, and of most reported decisions construing extortion under color of official

right, establish conduct from which inducement can readily be inferred. *See United States v. Jannotti,* 673 F.2d at 596 (payment made after "assurances that there would be no obstacles" to construction of hotel project); *United States v. Hedman,* 630 F.2d at 1188–91 (city building inspectors accepted concealed payoffs in return for nonenforcement of housing code); *United States v. Butler,* 618 F.2d at 418 (town public works commissioner accepted money from developer in exchange for moving up priority of his projects); *United States v. Price,* 617 F.2d at 458 (victim testified that if he did not pay city electrical inspector money, he would later have to pay "twice something for the same job"); *United States v. Braasch,* 505 F.2d at 151 (protection money extorted from bar owners by police officers); *see also United States v. Dozier,* 672 F.2d 531, 538 (5th Cir.) (state commissioner of agriculture "asked for ten thousand dollars in return for granting a charter to the owner of a livestock auction barn"), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *United States v. Barber,* 668 F.2d 778, 781 (4th Cir.) (state liquor control commissioner removed quantities of state-owned liquor from state warehouses and subsequently billed the liquor suppliers for the shortage), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. Scacchetti,* 668 F.2d 643, 646 (2d Cir.) (judge offered to assist automobile businessman with a license suspension case in return for free auto repair service), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982); *United States v. French,* 628 F.2d 1069, 1072 (8th Cir.) (city marshal accepted cash in return for settlement of forfeited bonds), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Williams,* 621 F.2d 123, 125–26 (5th Cir.1980) (school board member asked for and received airline tickets and cash from contractors doing business with the school board), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981); *United States v. Grande,* 620 F.2d 1026, 1031 (4th Cir.) (rea-

sonable inference that city housing director misused office by accepting money from prospective contractors in return for supplying cost data on prospective projects), *cert. denied,* 449 U.S. 830, 919, 101 S.Ct. 98, 317, 66 L.Ed.2d 35, 146 (1980); *United States v. Summers,* 598 F.2d 450, 452–53 (5th Cir.1979) (town public works official told contractor to "come up with five percent of the total bid price" if he wanted to get the contract); *United States v. Cerilli,* 603 F.2d 415, 418 (3d Cir.1979) (state transportation official demanded payments as a condition to state's leasing of privately owned snow removal equipment), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *United States v. Wright,* 588 F.2d 31, 34–35 (2d Cir.1978) (school board official's exchange of letter of intent to renew a contract for cash was evidence of extortionate demand), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Harding,* 563 F.2d 299, 301 (6th Cir.1977) (real estate commission's executive director sold copies of licensing exam and answers in advance of exam date), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *United States v. Adcock,* 558 F.2d 397, 400 (8th Cir.) (state liquor commissioner took kickbacks in return for his persuading liquor commission to purchase victims' wine), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *United States v. Brown,* 540 F.2d 364, 372–73 (8th Cir. 1976) (city building commissioner proposed scheme to funnel fees for demolition work to him which construction companies agreed to for fear of retribution); *United States v. Hall,* 536 F.2d 313, 317–18, 320–21 (10th Cir.) (allegation that governor in exchange for cash agreed to exert his influence for the benefit of the victims), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Hathaway,* 534 F.2d 386, 394 (1st Cir.) (state redevelopment authority director "used the office of [redevelopment director] to initiate and induce payments" in exchange for fair consideration of contract proposals), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Trotta,* 525 F.2d 1096, 1097–98 (2d Cir.1975) (indictment charged town public works commissioner with demanding and obtaining political contributions from contractors under his control), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Mazzei,* 521 F.2d 639, 643 (3d Cir.) (en banc) (victim testified that he gave state senator cash because he "thought that was the method that state leases were handled"), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Price,* 507 F.2d 1349, 1350 (4th Cir.1974) (per curiam) (payment of cash to county councilman in exchange for assurances that occupancy permit would be obtained); *United States v. Crowley,* 504 F.2d 992, 995 (7th Cir.1974) (police officers paid protection money); *United States v. Staszcuk,* 502 F.2d 875, 878 (7th Cir.1974) (alderman accepted cash in return for not opposing zoning ordinance amendments), *modified in part on other grounds,* 517 F.2d 53 (en banc), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *United States v. Hyde,* 448 F.2d 815, 833 (5th Cir.1971) (state attorney general threatened loan companies with lawsuits if cash payments were not made), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).

Our prior decisions reinforce our conclusion that wrongful use of office involves some action by the public official to induce the benefits given. The government mistakenly relies on *United States v. Trotta,* 525 F.2d 1096 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), where we reasoned that an "indictment is [not] defective because of its failure to allege 'a specifically identifiable misuse of office,' in which [the public official] engaged, as an unlawful *quid pro quo* or a consideration in the nature of official action running from [the public official] to [the victim] in return for the payment of the money not lawfully owed." *Id.* at 1100. However, the indictment in *Trotta* did allege that the public official demanded and obtained cash to which neither he nor his office was entitled. That demand, coupled

with the power of his public office, was a sufficient allegation of extortion. *Id.* ("the pressure exerted by [the public official] by means of the power of his public office to induce the payment of the money is, in itself, the misuse of the office"). Similarly, in *United States v. Scacchetti*, 668 F.2d 643 (2d Cir.), *cert. denied*, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982), we characterized the public official's role in committing extortion under color of official right as follows:

> The essential in the statute is the use of the office through acts unrelated to the duties of the public official but which could only be undertaken because of his official position. So long as the motivation for the payment focuses on the office of the recipient, the conduct falls within the ambit of the Hobbs Act. The government's proof was in this instance sufficient to demonstrate that the defendant made his demands in connection with the misuse of the authority of his public office.

*Id.* at 647. Thus, extortion under color of official right begins with the public official, not with the gratuitous actions of another. *See United States v. Barber*, 668 F.2d 778, 783 (4th Cir.) (voluntary payment of money is not extortion), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982).

■ There is no question that Congress has the power to proscribe the receipt of gratuities by federal officials and perhaps may use the commerce power to proscribe some instances of such receipt by state and local officials. It used the former power in 1962 when it enacted 18 U.S.C. § 201 (1982) as part of a comprehensive regulatory scheme governing the conduct of federal officials. 18 U.S.C. § 201(g) proscribes "a public official's receipt of a gratuity, to which he was not legally entitled, given to him in the course of his everyday duties ... [if] he was in a position to use his authority in a manner which could affect the giftgiver." *United States v. Nieder-*

*berger*, 580 F.2d 63, 69 (3d Cir.) (IRS employee convicted for receiving gratuities from oil corporations in the form of golfing trips), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978).

A public official convicted of violating 18 U.S.C. § 201(g) can be fined $10,000 or imprisoned for two years or both. The maximum penalty for a violation of the Hobbs Act is a $10,000 fine or twenty years imprisonment or both. The elements which the government must prove in a section 201(g) prosecution are remarkably similar to those in a Hobbs Act prosecution as erroneously interpreted by the district court in its instruction to the jury.[9]

Under the district court's jury instruction a federal official can be convicted of extortion under color of official right or illegal receipt of gratuities with evidence that he accepted benefits knowing they were given because of his official position. Yet, a federal official is subject to twenty years imprisonment plus a $10,000 fine under the Hobbs Act whereas he might receive at most *two years imprisonment* plus a $10,-000 fine if prosecuted for the same conduct under 18 U.S.C. § 201(g).

The enactment of 18 U.S.C. § 201(g) in 1962 prohibiting the receipt of gratuities by federal officials is a clear indication that Congress did not believe that the Hobbs Act prohibits such conduct. To expand the Hobbs Act's coverage beyond that intended by Congress oversteps the proper role of the judiciary. *See In re Grand Jury Subpoena (Persico)*, 522 F.2d 41, 65 (2d Cir. 1975) ("in moving beyond the confines of literal statutory language and of legislative history, courts must proceed cautiously for fear of overreaching their traditional role").

■ We realize that inducement can take many forms, some more subtle than others. Proof of a request, demand or solicitation, no matter how subtle, will establish wrongful use of public office; proof of a *quid pro quo* would suffice as would other circumstantial evidence tending to

---

**9.** Actually, the government's burden is lighter under the district court's jury charge in that a § 201(g) prosecution requires proof that the gratuity was given "for or because of any official act performed or to be performed by" such public official.

show that the public official induced the benefits. If the evidence established that O'Grady clearly created the impression, not by words but by deeds, that vendors whose business fortunes with the NYCTA depended on him were expected to make generous "gifts" to him, then O'Grady could not escape conviction. It would be easy for the government to prove, if it were so, that those who gave, profited, and those who did not, lost. However, there was very little evidence that O'Grady asked for or demanded benefits, that he offered *quid pro quo* in exchange for benefits, that he forestalled official action in anticipation of receiving benefits, or that he misused his public office in any way. Moreover, New York Air Brake, the most generous vendor ($14,580.71 of the $34,199.86 in benefits detailed in the indictment), played an insignificant role in the R–46 contract; its president testified that "New York City Transit has never been an important customer of ours. We have not gotten nothing [sic] but test quantities and token application there." Trial Tr. at 957. Yet, the prime contractor, Pullman-Standard, whom one would expect would have been the most generous if in fact its fortunes turned on pleasing O'Grady, accounted for only $5,903.74 of the $34,199.86 in benefits given to O'Grady over the nine year project. That is not to say that O'Grady could not have been found guilty on the facts of this case if the jury had been properly charged. One vendor testified that O'Grady once complained to him of insufficient generosity and that same vendor testified that on one occasion O'Grady's attitude toward his proposal improved after O'Grady was taken on an expense paid trip to Florida.[10] Overall, however, the evidence suggested only that O'Grady, like other officials of NYCTA, accepted what was offered. There is far less evidence of inducement in this case than in other cases where Hobbs Act convictions were upheld. *See, e.g., United States v. Dozier,* 672 F.2d 531, 538 (5th Cir.) (state commissioner of agriculture asked for ten thousand dollars in return for granting a charter), *cert. denied,* 459 U.S. 943, 74 L.Ed.2d 200 (1982); *United States v. Williams,* 621 F.2d 123, 125–26 (5th Cir.1980) (school board member requested money from contractors doing business with the board), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981).[11] A new trial is necessary because the charge to the jury omitted an essential element of the offense, *to wit,* a finding

**10.** The government emphasized one particular incident in 1977 as providing proof that O'Grady's official actions were influenced as a result of an expense-paid trip given to him by a vendor. The General Electric Company, a subcontractor to Pullman-Standard, had problems at that time manufacturing traction motors, control equipment and gear equipment to contract specifications. O'Grady's department complained that the motors vibrated excessively and that a particular electrical component was not sufficiently sturdy. In addition, O'Grady's department rejected as many as 80% of certain gearbox seals because of tiny perforations in them. General Electric did not agree with O'Grady's evaluation and tried to discuss the problem with various NYCTA officials. After General Electric unsuccessfully tried to persuade NYCTA to conduct certain tests on the equipment, the company instructed one of its engineers to take O'Grady to Orlando, Florida, at company expense, so that O'Grady could visit the service shops of the Walt Disney Company where General Electric components operated successfully in the monorail cars at Disney World. In Orlando, O'Grady and the engineer discussed business, rode the monorail and visited the maintenance shop, but for the greater portion of the trip they played golf. Mr. Martin Simon, the former General Electric engineer who accompanied O'Grady to Florida, testified that when O'Grady returned from the trip, General Electric was successful in having the tests performed on their equipment. Trial Tr. at 320–42.

**11.** The government has maintained that this case is akin to *United States v. Barber,* 668 F.2d 778 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982), in that "when gifts of that quantity and of that nature are given over an extended period of time, the irresistible conclusion is that in fact they were not gifts, but that they were given to forestall a negative action being taken." This case is distinguishable because the defendant in *Barber,* a member of the state liquor control commission, *took* state owned liquor from state warehouses and subsequently billed the companies that had originally sold the liquor to the state. Unlike *Barber,* there was no evidence that O'Grady so used his office to obtain or induce the benefits that were given to him by R–46 contract vendors.

that O'Grady misused his office to obtain benefits not due him or his office.

We do not approve of O'Grady's course of conduct which may well have violated ethical codes and state laws. We cannot agree, however, that O'Grady may be convicted under the Hobbs Act of the practices detailed in the indictment unless the jury charge makes clear that this offense requires the jury to find that the public official did something, under color of his office, to cause the giving of benefits. Public officials occupy unique positions of influence and power in our society and are the focus of great admiration and attention as well as intensive lobbying. Vast sums of money are spent in efforts to persuade, cajole or appease them.[12] The jury charge given by the district court would make the mere receipt of a benefit by a public official, whether a hot dog from a street vendor or an expense-paid vacation to Disney World, punishable under the Hobbs Act with up to twenty years imprisonment and a $10,000 fine.[13] This interpretation of the Hobbs Act would place every public official in jeopardy by virtue of his status rather than his venal acts. *Cf. Robinson v. Cali-*

12. The district court recognized the difficulty in distinguishing the motive of those who bestow benefits on public officials:

THE COURT: When I was the village attorney in Long Island and believe me, as far as I know the Good Humor company had nothing to do with the village attorney, and I am not sure they gave it to me because I was village attorney—but I remember them driving me back when I appeared for the Mackitan Company in a local matter, and I found out that they spread Good Humor around Nassau County and they said they gave all the officials cakes for Mother's Day, every Supreme Court Justice and every official and they found out I was village attorney and the next Mother's Day there appeared on my doorstep a Good Humor cake which was whipped cream well-melted, but nonetheless a cake. I think it was probably too late to do anything other than eat what was left of it, or toss it in the wastebasket.

The point is, under your interpretation, I guess that is a violation of the Hobbs Act.

PROSECUTOR: Did you go back the next day and say, boy, was that good?

THE COURT: No. I never talked to them.

PROSECUTOR: There is really a difference there.

THE COURT: Why?

PROSECUTOR: Because that would come under the heading of a gift.

. . . .

PROSECUTOR: There is a big difference between handing a gift to somebody and someone giving something to someone motivated by a public official's power.

THE COURT: I know several [state] Supreme Court Justices, whom I asked, and they said they got a cake—

PROSECUTOR: Was Good Humor a plaintiff or defendant in a case before them?

THE COURT: Yes.

PROSECUTOR: They should have returned it. What year was this?

Statutes can be enforced, yes, in a manner that [of]fends the Constitution, I suppose, but this is not one of those times.

PROSECUTOR: The question of degree goes to prosecutorial [discretion] rather than a violation of the Constitutional sta[ndard].

If someone takes a candy bar under the Hobbs Act, that person does not get indicted. But when you have $35,000 worth of benefits, the degree of abuse at that point leaves the Government no choice but to prosecute.

PROSECUTOR: It indicates criminal intent and conduct that is very blatant and that cries out for prosecution.

Otherwise, people can walk into a situation ask absolutely no questions, the graft and *corruption going on all the time*—everybody else does it, I will do it—and no one will get prosecuted.

Trial Tr. at 492–95.

13. The district court was also worried about what it termed the question of "degrees:"

THE COURT: I am not worried about that. Do you have any cases that discuss this question of degree?

Am I not just as guilty if I take a lunch from you today, and that's all I take, as if I took 15 lunches from you—

PROSECUTOR: Yes, if it's done with the intent required by the Hobbs Act.

THE COURT: I know you are taking me to lunch because I am a Judge. I have never known you in any other capacity.

PROSECUTOR: . . . The question of degree really relates to the exercise of discretion. People charged under the State [law], are charged with taking the free lunches and dinners, but there is no evidence to support the extent of the activity, to support—they are nowhere near what Mr. O'Grady took.

THE COURT: That is not the question. If I took one lunch—

PROSECUTOR: Yes.

THE COURT: It's not a question of degree.

PROSECUTOR: We exercise prosecutorial discretion and don't charge everybody. That is true with respect to almost any Statute.

Trial Tr. at 486–88.

*fornia,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

■ The position of the United States Attorney's office in this matter, that the "Hobbs Act may be viewed as enacting a special code of integrity for public officials," [14] is unsettling at best. The government assures us that "as a matter of prosecutorial discretion, it would make no sense to attempt to prosecute for ... *de minimus* [sic], ambiguous conduct." *Id.* The fact that ambiguous conduct *could* be prosecuted under the government's interpretation raises serious constitutional questions of fair notice and overbreadth and makes a mockery of the principle that criminal statutes must be construed strictly with any ambiguity resolved in favor of lenity. *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973) (citations omitted); *cf. United States v. Chestnut,* 394 F.Supp. 581, 591 (S.D.N.Y. 1975) (narrow construction of criminal statute meets "least drastic means" test), *aff'd,* 533 F.2d 40 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). The fact that United States Attorneys are responsible and fair-minded persons offers little comfort here. The evil of selective prosecution is not avoided by the likelihood that *de minimis* violations will be overlooked. We remain a nation of laws rather than of men.

The panel opinion is vacated. The judgment of conviction is reversed and this case is remanded to the district court for a new trial.

PIERCE, Circuit Judge, with whom FEINBERG, Chief Judge, IRVING R. KAUFMAN, JON O. NEWMAN, KEARSE, CARDAMONE, WINTER and GEORGE C. PRATT, Circuit Judges, join, concurring.

■ I concur in the majority opinion and in its holding that inducement is an essential element of the crime of extortion in a Hobbs Act prosecution and, therefore, that the district court erred in instructing the jury that "[t]he Government need not show that the defendant in words or otherwise, induced, requested, demanded, or solicited the benefits" received. I write separately, however, to emphasize that where warranted by the evidence, as herein, the jury should be permitted to infer inducement by the defendant based upon a finding of repeated acceptances over. a period of time of substantial benefits (i.e., benefits of a nature and magnitude which reasonably could affect a public official's exercise of his or her duties).

The majority opinion recognizes that inducement "can take many forms, some more subtle than others." My concern is that while in some cases there may be express inducement, in other cases, it may be implied. The issue. of whether there exists inducement, express or implied, must be determined by the fact-finder, here a jury. In this case, the jury instruction was erroneous because in effect it mandated an inference of inducement merely upon a finding of acceptance of benefits with knowledge of the donor's motivation. Given a correct instruction, however, the jury would have been free, if it chose to do so, to infer inducement from a finding of repeated acceptances over a period of time of substantial benefits. Such an instruction would recognize that the repeated acceptances of such benefits could, although it need not necessarily, constitute a communicative act amounting to inducement by implication. In short, given a proper charge, the jury could find that such continued acceptances of unwarranted benefits served to communicate a message inducing such benefits and, thus; constituted extortionate misuse of the power of public office.

JON O. NEWMAN, Circuit Judge, with whom WINTER and GEORGE C. PRATT, Circuit Judges, join, concurring.

Judge Winter, Judge Pratt, and I agree with the entirety of Judge Meskill's com-

---

14. Letter from Raymond J. Dearie, United States Attorney for the Eastern District of New York, to the United States Court of Appeals for the Second Circuit (Jan. 21, 1983) (clarifying government's response to questions raised at oral argument of *United States v. O'Grady,* No. 82–1344 (2d Cir. argued Jan. 19, 1983)).

prehensive opinion and would have preferred simply to join that opinion without additional comment. However, the concurring opinion of Judge Pierce and the division within the in banc court with respect to that opinion prompts us to reconsider and revise our position, solely in the interests of what we deem to be sound judicial administration. Judge Pierce, while concurring in Judge Meskill's principal opinion for the in banc court, expresses the additional view that upon the retrial of this case the jury should be instructed that it may infer the requisite inducement on the part of the defendant from a pattern of his "repeated acceptances over a period of time of substantial benefits," if the jury is persuaded that such a pattern "constitute[s] a communicative act amounting to inducement by implication." 742 F.2d at 694. The in banc court is divided five to five on whether the "pattern-of-receipt" instruction suggested by Judge Pierce should be given, with three judges expressing neither approval nor disapproval.

Judge Winter, Judge Pratt, and I are among those inclined not to favor the "pattern-of-receipt" instruction, believing it more appropriate to the crime of receiving unlawful gratuities than to the crime of extortion under the Hobbs Act. However, our views on the merits of the instruction are outweighed by our firm conviction that every appellate court, and especially an in banc court,[1] has an obligation to make clear its holding for the guidance of the trial court in the case at hand and for trial courts in subsequent, similar cases. The inevitable imprecision of language doubtless leaves some ambiguity in even the most well-crafted opinions, but a five-to-five standoff with respect to a jury instruction poses a needless and unacceptable risk of uncertainty. The traditional rule that an equal division within a reviewing court affirms the judgment on appeal, see Neil v. Biggers, 409 U.S. 188, 191–92, 93 S.Ct. 375, 378–79, 34 L.Ed.2d 401 (1972), would provide no guidance to the trial judge in determining whether or not to give the "pattern-of-receipt" instruction. We consider this standoff an inadequate discharge of the appellate function that should not remain if, in good conscience, it can be resolved.

■ In these circumstances, and solely to form a clear majority, we join not only Judge Meskill's opinion but also the concurring opinion of Judge Pierce. As we understand it, this means that the in banc court, by a vote of eleven to two, remands the case for a new trial, at which, by the affirmative votes of eight members of the in banc court, the instruction outlined in Judge Pierce's concurring opinion may be given, if supported by the evidence.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part.

As is apparent from disparate judicial interpretations, the phrase "under color of official right", standing alone, is vague almost to the point of unconstitutionality. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982). Uncertainty would be exacerbated if this Court were to adopt the test of reasonableness espoused by the panel majority and the en banc dissenters, who would impose liability only if an official received property that "could reasonably be perceived as likely to affect his exercise of his public duties." The criminality of conduct seldom is established by applying a test of reasonableness. See, e.g., United States v. Bright, 517 F.2d 584, 587 (2d Cir.1975); United States v. Jacobs, 475 F.2d 270, 287 (2d Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 116 38 L.Ed.2d 53 (1973); People v. Mackell, 47 A.D.2d 209, 218–19, 366 N.Y.S.2d 173 (1975), aff'd, 40 N.Y.2d 59, 386 N.Y.S.2d 37, 351 N.E.2d 684 (1976). Even when terms such as "recklessness" and "negligence" are used in a criminal statute, they usually are "intended to connote deviations from reasonableness signif-

1. The failure of an in banc court to rule authoritatively on the issues before it, if unremedied, would undermine the justification for convening such a court and thereby impair a procedure that should remain available and effective for those infrequent occasions when its use is justified.

icantly greater in degree than the ordinary kinds of misfeasance which may suffice for civil purposes." 1 C. Torcia, *Wharton's Criminal Law* § 27, at 141 (14th ed. 1978).

However, while I agree with the en banc majority that the panel decision should be reversed, I believe the majority require more proof by the Government than the Act requires. It would be better, I believe, simply to continue the judicial gloss which this Court and most others have applied to this portion of the statute; namely, that it incorporates the common law definition of extortion. *See United States v. Trotta*, 525 F.2d 1096, 1100 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Jannotti*, 673 F.2d 578, 594–95 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Dozier*, 672 F.2d 531, 539 (5th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *United States v. Hedman*, 630 F.2d 1184, 1195 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

Common law extortion is the unlawful taking by any officer under color of his office of "any money or thing of value that is not due him, or more than is due, or before it is due." *United States v. Trotta*, *supra*, 525 F.2d at 1100 n. 8. To constitute extortion under the common law, the taking must have been done with corrupt intent. *People v. Clark*, 242 N.Y. 313, 325, 151 N.E. 631 (1926); 3 R. Anderson, *Wharton's Criminal Law & Procedure* § 1394 (1957); 1 W. Burdick, *The Law of Crime* § 277 (1946).

When Congress borrows terms of art from the common law, "it presumably knows and adopts the cluster of ideas" that are attached to them. *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952). Accordingly, in the prosecution of a public official under the Hobbs Act, the Government is required to prove corrupt or criminal intent on the part of the accused, *i.e.*, an intent to do knowingly and willfully that which is condemned as wrong by law. *See United States v. Price*, 617 F.2d 455, 460 (7th Cir.1979); *United States v. Adcock*, 558 F.2d 397, 402 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). If the Hobbs Act, as thus interpreted, is charged correctly, no public official will be convicted for accepting without a quid pro quo a cigar, a cigarette, a hot dog, or even a trip to Disneyland.

Moreover, if the gift is sufficiently modest that it does not deplete the resources of the giver and elicits no action of any sort in response, it is unlikely to cause even the modest interference with interstate commerce that is an essential element of a Hobbs Act crime.

The majority quite properly is concerned about Hobbs Act charges being based upon small, unsolicited gratuities. I share their concern. However, the majority's interpretation of the Act which requires "some action by the public official to induce the benefits given" and mandates that "extortion under color of official right [begin] with the public official," applies to large benefits as well as small ones. Apparently, Second Circuit juries henceforth must be instructed that, if the idea for the gift— no matter how large the gift may be—originated in the mind of the giver rather than that of the public official, the jury must acquit. I doubt this is what Congress intended.

I suggest that, if our trial judges bear in mind that violation of the Hobbs Act is a malum in se offense, an essential element of which is the existence of mens rea, there will be no need for this Court to stand alone and apart from the other Circuits in its interpretation of the Act.

MANSFIELD, Circuit Judge, with whom LUMBAAD, Circuit Judge, joins (dissenting).

With due respect I must dissent.

Contrary to the majority's characterization of the case before us, the issue we face is *not* whether the defendant in a Hobbs Act prosecution must induce the giving of benefits; a fair reading of the

record shows that the district court properly charged the jury that it must find inducement. The real question in this case is the nature of the evidence of inducement that the government must present. The majority here rules that the prosecution must show more than the district court required, yet it gives absolutely no indication of what this "more" entails. Because today's decision conflicts with all precedent of this and other circuits, and because it creates a "standard" that is both unknowable and unworkable, I dissent.

More specifically, the question before us is whether a public official violates the Hobbs Act prohibition against "obtaining of property from another, with his consent ... under color of official right," 18 U.S.C. § 1951(b)(2), when he receives more than $34,000 worth of benefits over a period of years from contractors with business pending before him, knowing that the benefits are paid because of his power as an official to take action that would be helpful or harmful to them. In my view this is the very type of corruption or "wrongful use of official power," *United States v. Margiotta*, 688 F.2d 108, 131 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), against which the Hobbs Act is directed.

To require proof of affirmative or express words or acts of inducement on the part of the official, as the majority seems to read into the statute, sacrifices substance for form. A corrupt official, well aware of the power he possesses by virtue of his office, does not shout his demands. He lets it be known in subtle ways what is expected of those doing business with him. His continued acceptance of substantial "gifts" is an advertisement that speaks louder than words. The message is simply that those doing business with him must pay or face the consequences. Spoken words are often unnecessary. A mere wink or gesture will do. In the world of official corruption the repeated acceptance of lavish benefits (in this case on 43 occasions for periods of 2 to 6 days each) tells those dependent on the recipient's official action what they must do to gain official approval or avoid unfavorable rulings. The official can easily return "gifts" known to be made because of his power to take action that will be helpful or harmful to the donors, and let it be known that such benefits are not welcomed.

In such Hobbs Act cases there is no risk that an official would be held to violate the Act by his mere passive acceptance of a "hot dog from a street vendor" (Maj.Op. 693). The majority incorrectly suggests (Maj.Op. 694) that only prosecutorial discretion could prevent such prosecutions; in fact, the law requires that the benefit be sufficiently large that a reasonable person could conclude it had the capacity to influence the public official. Indeed, Judge Platt properly instructed the jury that before it could convict it must find "beyond a reasonable doubt that ... *material and substantial* benefits were provided...." (Transcript 1793, emphasis added). If a mere hot dog were at issue, no reasonable person would infer that an official would be influenced in the performance of his duties by such a miniscule "benefit." In the present case, if the payments had stopped after the first trip or two, that undoubtedly would have ended the matter. Absent further evidence, the district court would probably have granted a judgment of dismissal on the ground that no reasonable basis existed for an inference of misuse of official power, particularly if O'Grady had expressly refused to accept further expensive trips. However, we are not here confronted with such minutiae but with payments for some 43 trips to pleasure resorts combined with golf, lavish food and entertainment over a period of several years, in addition to all-events season tickets to Madison Square Garden, totalling a minimum of $34,199.86.[1] There was noth-

---

1. Government Exhibit 12–3 shows that companies doing business with the Transit Authority spent the following amounts on "entertainment" expenses for O'Grady between 1972 and 1981:

| | |
|---|---|
| Pullman | $ 5,903.74 |
| Abex | 2,902.09 |
| Ellcon | 2,611.01 |
| General Electric | 2,043.27 |

| | |
|---|---|
| Luminator | 598.34 |
| McGraw Edison | 2,789.32 |
| New York Air Brake | 14,580.71 |
| Rockwell | 601.82 |
| Standard Steel | 572.55 |
| WABCO | 687.51 |
| Walton | 227.58 |
| Westcode | 681.92 |
| TOTAL | $34,199.86 |

The evidence at trial indicated that these figures are underestimates of the actual amount of benefits provided by O'Grady, since these figures include only amounts listed on vouchers, and do not include amounts billed by other means.

For instance the figures do not include numerous meals and golf games furnished by vendors to O'Grady when they met with him in New York City or on Long Island or when he made inspections at their plants. (See, e.g., T. 276–83). The figure do not include personal gifts made by contractors to O'Grady, such as golf clubs or GE toasters. (T. 347–50). In some instances O'Grady not only accepted the benefits from contractors but collected from the New York City Transit Authority payment for meals furnished by the contractor. (Tr. 1653).

Government Exhibit 12–2 listed the trips to resorts taken by O'Grady and paid for in part or in full by vendors:

| | | | |
|---|---|---|---|
| 3/23–26/72 | Greenbrier White Sulphur Springs West Virginia | New York Air Brake (NYAB) | Food, Lodging, Golf, Travel (Wife) |
| 3/21–25/73 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 6/13–16/73 | Greenbrier White Sulphur Springs West Virginia | McGraw-Edison | Food, Lodging, Golf (Wife) |
| 3/28–31/74 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 8/2–4/74 | Lakeview Inn Country Club Morgantown, W. Va. | Wabco | Food, Lodging, Golf, Partial Travel |
| 1/25–26/75 | San Antonio Country Club San Antonio, Texas | Luminator | Food, Golf, Lodging, Partial Travel |
| 3/14–16/75 | Riviera Country Club California | Luminator | Food, Lodging, Golf |
| 3/19–23/75 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 6/26–29/75 | Seaview Country Club New Jersey | Ellcon | Lodging, Golf |
| 12/17–21/75 | Bent Tree Country Club Dallas, Texas | Luminator & General Electric | Food, Lodging, Golf (Car Rental) |
| 3/24–28/76 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 4/29–5/2/76 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel |
| 5/5–8/76 | Lakeview Inn Country Club Morgantown, W. Va. | Wabco | Food, Lodging, Golf, Partial Travel |
| 5/14–16/76 | ITT Golf Course Boston, Mass. | Pullman & ITT | Food, Lodging, Golf |
| 6/4–5/76 | Seaview Country Club Absecon, N.J. | Standard Steel | Food, Lodging, Golf (Wife) |
| 7/7–11/76 | Hyatt on Hilton Head | N.Y.A.B. | Food, Lodging, Travel, Golf |

| | | | |
|---|---|---|---|
| 11/16–17/76 | Pine Valley New Jersey | Abex, Pullman, etc. | Food, Golf, Lodging |
| 2/25–27/77 | Innisbrook Country Club Tarpon Springs, Fla. | Rockwell | Food, Lodging, Golf, Travel |
| 3/9–14/77 | Disney World Orlando, Fla. | General Electric | Food, Lodging, Golf, Travel |
| 3/23–27/77 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 5/5–8/77 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel |
| 6/7–11/77 | Tides Inn Irvington, Va. (Little Masters) | McGraw-Edison | Food, Lodging, Golf (Wife) |
| 6/23–25/77 | Seaview Country Club Absecon, N.J. | Ellcon | Food, Lodging, Golf |
| 7/7–11/77 | Gaylord, Michigan | Rockwell | Food, Lodging, Golf, Partial Travel |
| 7/13–17/77 | Disney World Orlando, Fla. | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 10/28–29/77 | Seaview Country Club Absecon, N.J. | Standard Steel | Food, Lodging, Golf (Wife) |
| 11/2–3/77 | Pine Valley New Jersey | Ellcon, Abex, Rockwell | Food, Lodging, Golf |
| 3/15–19/78 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 5/3–7/78 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel |
| 5/31–6/4/78 | Tides Inn Irvington, Va. | McGraw-Edison | Food, Lodging, Golf (Wife) |
| 6/22–25/78 | Seaview Country Club New Jersey | Ellcon | Lodging, Golf (Wife) |
| 7/12–16/78 | Myrtle Beach Hilton Myrtle Beach, S.C. | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 10/13–15/78 | ITT Golf Course Boston, Mass. | ITT | Food, Golf |
| 11/1–2/78 | Pine Valley New Jersey | Rockwell, etc. | Food, Lodging, Golf |
| 3/21–25/79 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 5/3–6/79 | Greenbrier White Sulphur Springs | N.Y.A.B. | Food, Lodging, Golf, Travel |
| 5/30–6/3/79 | Tides Inn Irvington, Va. | McGraw-Edison | Food, Lodging, Golf (Wife) |
| 3/26–30/80 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 5/1–4/80 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel |

ing "de minimis" or "ambiguous" (Maj.Op. 694) about O'Grady's conduct.

The majority bases its decision on the ground that there was "very little" evidence of direct solicitation of benefits by O'Grady (Maj.Op. 692) and that the court's instructions therefore were crucial. But there was an enormous amount of circumstantial evidence. The record reveals that O'Grady made clear to all contractors concerned what he expected from them; one vendor, for instance, testified that O'Grady had developed a reputation for "taking almost anything that was given to him." (T. 208). Indeed, he clearly created the impression that he expected contractors to make generous "gifts" to him if they wanted to get his ear, not only by establishing a pattern of repeated acceptance but by other conduct. For instance, he criticized one contractor, General Electric Company, as "tight" and "not generous." (T. 345–47). He complained of excessive motor vibration, causing GE motor brushholders to fall apart, rapid wear of GE electric circuit "contactor tips" and tiny holes in its gear box seals. (T. 320–27). General Electric thereupon provided O'Grady with a 5-day all-expense trip to Disney World in Orlando, Florida, including travel, food, lodging and golf, at the cost of $986.72. During the course of the five days he spent a short time riding the Disney monorail system which had "contactor tips" like those sold by General Electric to the Transit Authority. (T. 334). However, nothing was discussed with the GE representative that could not have been discussed in New York. (T. 335). O'Grady then withdrew his complaint that GE's traction motors and equipment provided for the R–46 project did not meet contract specifications and rescinded his prior rejection of some 80% of the contractor's gear-box seals. (T. 341–42, 592). The result was undoubtedly a very substantial saving for the contractor, many times the amount paid by it to O'Grady. However, it left open the question of whether the public did not suffer serious harm. Indeed, the City later recovered a $72 million judgment against two of the donating contractors for defects in the R–46 subway cars inspected under O'Grady's supervision. *New York v. Pullman*, 662 F.2d 910 (2d Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

Under the circumstances it would be difficult for any reasonable person not to conclude that the contractors' payments to O'Grady of over $34,000 in benefits were induced by him and made in the belief that they would influence his official action. To label this continued practice a mere cultivation of "goodwill" or "positive customer-vendor relationship" (Maj.Op. 685), comparable to giving a cigar or a Good Humor cake or ice cream to an official (Maj.Op. n. 12), is tantamount to condoning obvious corrupt and wrongful use of public office, against which the Hobbs Act is aimed. That such corruption may be widespread, which I seriously doubt, is no more an excuse barring prosecution under the Hobbs Act than was the prevalent dishonesty in Boss Tweed's day or the "custom" followed for many years by American companies of giving money to officials of foreign governments with whom they did business. Congress rejected precisely such an argument in enacting the Foreign Corrupt Practices Act of 1977, Pub.L. No. 95–213, 91 Stat. 1494 (1977). In the House report, H.R.Rep. No. 640, 95th Cong., 1st Sess. 4 (1977), the Congress stated:

| 7/29–8/2/80 | Hyatt on Hilton Head South Carolina | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
|---|---|---|---|
| 3/25–30/81 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf, Travel (Wife) |
| 4/30–5/3/81 | Greenbrier White Sulphur Springs West Virginia | N.Y.A.B. | Food, Lodging, Golf |
| 6/3–7/81 | Tides Inn Irvington, Virginia | McGraw-Edison | Food, Lodging, Golf (Wife) |

"More than 400 corporations have admitted making questionable or illegal payments. The companies, most of them voluntarily, have reported paying out well in excess of $300 million in corporate funds to foreign government officials, politicians, and political parties. These corporations have included some of the largest and most widely held public companies in the United States; over 117 of them rank in the top Fortune 500 industries. The abuses disclosed run the gamut from bribery of high foreign officials in order to secure some type of favorable action by a foreign government to so-called facilitating payments that allegedly were made to ensure that government functionaries discharged certain ministerial or clerical duties."

Nor does the evidence support the claim that O'Grady thought his acceptance of $34,000 in "gifts" constituted "business as usual." His consciousness of his wrongdoing is evidenced by his strict instructions to inspectors under his supervision not to take anything from contractors (T. 983, 1013–14, 1020), his false statements to Department of Justice Investigator Anthony Valenti denying that he had received anything approximating the many benefits that had been given him (T. 1102–08, 1162–63), and his perjurious statements regarding the benefits, which he made in civil litigation instituted by New York City because of defects in the R–46 subway cars inspected under his supervision (T. 1556–63). All of this evidence must, of course, be construed at this stage in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Despite this clear proof of corruption the court reverses the conviction on the ground that the instructions given by the trial judge with respect to what constitutes "obtaining of property from another, with his consent ... under color of official right" were erroneous. The court now reaches out to develop this issue despite its not properly being before us. Appellant completely failed to raise it initially on the appeal. Upon his original appeal O'Grady

claimed error only on the grounds (1) that the government had failed to show "force, fear, or duress," a contention we had rejected in *Margiotta, supra,* 688 F.2d at 131, and (2) that there was insufficient proof that he delivered any *quid pro quo* to the contractors for the benefits paid to him, which we had also previously held not to be an essential element of the crime, *United States v. Trotta,* 525 F.2d 1096, 1100 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); see also *Margiotta, supra,* 688 F.2d at 133; *United States v. Wright,* 588 F.2d 31, 35 n. 2 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979). (See Appellant's Brief filed Dec. 6, 1982).

The adequacy of the trial judge's instructions was raised entirely *sua sponte,* appearing for the first time in Judge Meskill's panel dissent, followed by the court's decision to hear the case *en banc* despite appellant's failure to file any petition for rehearing. It was only then that appellant took the cue and raised the issue of the jury charge in his *en banc* brief. In my view the court goes too far in using this case as a vehicle to volunteer its interpretation of the Hobbs Act rather than to follow the normal course of waiting until the issue is properly raised by the parties in a case squarely presenting it. The error is compounded by the fact that, even under the court's interpretation of the Act, a clear violation is shown. As Judge Meskill concedes, his opinion is not intended "to say that O'Grady could not have been found guilty on the facts of this case if the jury had properly been charged." (Maj.Op. 692).

Turning to the district court's instructions to the jury, neither I nor the district court would disagree with the majority's view that in order to be guilty of "obtaining ... property ... under color of official right" an official must, acting under color of official right, have "induced" a person doing business with him to provide him with a benefit that could reasonably be expected to influence his official conduct and that the "inducement" may consist of

his "misuse" of his office. As we stated in *Margiotta, supra,* 688 F.2d at 132:

> "[I]t is the utilization of the power of public office to induce consent of the payments that is the gist of an offense of obtaining money 'under color of official right.' *See, e.g., United States v. Jannotti,* 673 F.2d 578 (3rd Cir.) (Hobbs Act covers actions by public officials under color of official right even when payment is not obtained by force, threats or use of force), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The use of public office, with the authority to grant or withhold benefits, takes the place of pressure or threats."

Indeed, the indictment here, which was read in its entirety by Judge Platt to the jury, expressly alleges that the contractors' consent to the making of gifts to O'Grady was "wrongfully induced under color of official right" and the court charged the jury that such inducement under color of official right was an essential element of the crime. Said the court:

> "Now the indictment, which I have just read to you, charges that the defendant unlawfully did attempt to affect commerce and did affect commerce, and the movement of goods in commerce, by knowingly and wilfully obtaining specified benefits for himself and others from the Pullman Company and from other companies who did work on the R–46 contract, *with the consent of the company and/or companies to give the defendant the benefits having been induced under color of official right.*
>
> \* \* \* \* \* \*
>
> "The issue you must decide is whether the defendant's conduct constituted extortion, as Congress used the term, in the statute the defendant is accused of vio-

lating—*which is obtaining property with consent induced under color of official right.* I will discuss this aspect of the charge with you in a moment.

> "There are four elements to the crime of extortion as defined in this statute, each of which must be proven by the Government beyond a reasonable doubt.
>
> \* \* \* \* \* \*
>
> "First, there must be an obtaining of property of another with his consent. There is no dispute as to this element and it has been agreed that it has been proven.
>
> "*The second element, which is one of the ones in dispute, is that the consent must be induced by extortion, that is, i.e. under color of official right. That is one that is in dispute.*
>
> "The third element is that the act of obtaining by these means by the defendant must be knowing and wilful. This is in dispute.
>
> "And finally the act of obtaining property by these means must affect commerce. That is not in dispute." (T. 1778–81, emphasis added).

As the district court recognized, however, the terms "inducement," "color of official right" and "misuse" of office are generalities; they must be applied according to some definitive standard. The majority, without advancing any standard, simply reverses on the ground that certain sentences in Judge Platt's charge to the jury, when considered separately, may be interpreted to indicate that no inducement need be shown and that the government may satisfy the statute by proving only that benefits were passively received by the official with knowledge that they were bestowed on him because of his official position.[2] Extrapolating from these isolat-

---

**2.** The principal sentences relied on by the majority are as follows:

> "The Government need not show that that defendant in words or otherwise, induced, requested, demanded, or solicited the benefits from the companies involved.
>
> "So long as the motivation for the bestowal of any of the benefits focused on Mr. O'Grady's office—that is, so long as the office or the

fact of his official position, induced the payments—and so long as the defendant knew such was the case—then the conduct falls within the ambit of the Statute." (T. 1784). However, the foregoing immediately followed the instruction that the government must prove that the benefits were bestowed because the contractor "reasonably believed that ... the defendant had the power to affect, or influence

ed statements, the court suggests that the instruction would criminalize any gift to a public official, however small or innocent, and that it must therefore be rejected.

The majority's analysis suffers from a deficiency, in my view fatal; it ignores still other portions of the instructions which required the jury, before it could convict, to find that the benefits were induced by the contractors' belief that they would forestall any harmful official action by O'Grady. We are not permitted to disregard these qualifications which were expressly integrated in the charge; we are required to read Judge Platt's instructions as a whole. In *United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975), the Supreme Court stated:

"Turning to the jury charge in this case, it is of course arguable that isolated parts can be read as intimating that a finding of guilt could be predicated solely on respondent's corporate position. But this is not the way we review jury instructions, because 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973). See *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926).

\* \* \* \* \* \*

"Moreover, in reviewing jury instructions, our task is also to view the charge itself as part of the whole trial. 'Often isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the *trial.*' *United States v. Birnbaum*, 373 F.2d 250, 257 (CA2), cert. denied, 389 U.S. 837 [88 S.Ct. 53, 19 L.Ed.2d 99] (1967)." (Emphasis in *Park*).

See also *United States v. Velez*, 652 F.2d 258, 261 (2d Cir.1981); *United States v. Precision Medical Laboratories, Inc.*, 593 F.2d 434, 443 (2d Cir.1978); *United States v. Hanlon*, 548 F.2d 1096, 1101 (2d Cir. 1977); *United States v. Gentile*, 530 F.2d 461, 469 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976). When the charge here is read in its entirety, it clearly and repeatedly informs the jury that it might find the defendant guilty only if it found beyond a reasonable doubt (1) that *"the defendant had the power to affect, or influence the company's interest in the delivery of the R–46 Pullman subway car"* (T. 1783, emphasis added), including *"the power to take or withhold action that could hurt or benefit the company, or to affect or influence the inspection and delivery of the R–46 subway car ...,"* (T. 1785, emphasis added); (2) that "the benefits were bestowed because the [donor] company ... reasonably believed that in his capacity as Superintendent of the Quality Control Section Department of New Car Engineering, New York City Transit Authority," (T. 1783) the defendant had such power; and (3) "that the defendant knew that that [was] the reason travel and entertainment benefits were given to him...." (T. 1785–86). The jury was further told that "if either or both of these facts has not been so proven beyond a reasonable doubt ... you must find for the defendant." (T. 1786). These elements amount to wrongful use of public office.

Judge Platt went on to instruct the jury that, although proof of use of force or the giving of a *quid pro quo* by the official was unnecessary because "the crime is complete if the public official accepts a benefit knowing it was given with a focus on his office[,] it is of course appropriate to consider whether any of the companies involved *expected that, by bestowing benefits on the defendant, he would not exer-*

---

the company's interest in the delivery of the R–46 Pullman subway car to the City of New York." (T. 1783–84).

Moreover the sentences relied on by the majority were immediately followed by an instruction that to find the defendant guilty the jury must first find beyond a reasonable doubt that

the benefit was conferred "because the company reasonably believed that, in his official capacity, Mr. O'Grady had the power to take or withhold action that could hurt or benefit the company ... and ... that the defendant knew that that [was] the reason travel and entertainment benefits were given to him ...." (T. 1785–86).

cise his power to the detriment of the company. Such an expectation, if proven, establishes that the company gave the benefits focused on the defendant's office." (T. 1787–88, emphasis added).

Thus, although certain sentences in the charge, if taken out of context, might support the majority's view that Judge Platt required the government to prove only that O'Grady received benefits with knowledge that they were bestowed upon him because of his office, the context in which these sentences appear makes clear that the phrase "because of or focused on the office of the public official" meant that the government also was obligated to prove that the benefits were given because of the official's power "to take or withhold action that could hurt or benefit the company" (T. 1785). A more complete quotation from the charge, which shows the relevant context, is set forth in the margin.[3] When one reads the charge in its entirety, it is apparent that it did *not* dispense with the requirement that the defendant "induce" the benefit; on the contrary, the district court

**3.** The following is a more complete verbatim copy of the pertinent portions of the court's charge:

"Now with regard to the second element, one of the two you must turn your attention to, that is, that the property was obtained under color of official right. The offense of obtaining property under color of official right was intended by Congress to prohibit the obtaining of something of value, be it money or any other benefit, by a public official, through the wrongful use of his office, where the benefit is not lawfully due and owing to him or the office which he holds. There need be no specific acts by the public official threatening economic loss, so long as the person—which includes a corporation—consents to giving the property, or benefit, because of or focused on the office of the public official who obtains the property. Similarly, so long as the benefit is given because of or focused on the office held by the official, there need be no promises made by the official to do or to refrain from doing anything in return for receiving the benefit. In other words, the giving of a quid pro quo is not an essential element; the gravamen of the offenses [sic] the obtaining by a public official or property to which he is not entitled, which focuses on the office he holds.

 \* \* \* \* \* \*

"Under this Statute, no showing of fear on the part of the bestower of the benefit is required; what must be established is that any of the benefits were bestowed because the company that bestowed a benefit reasonably believed that in his capacity as Superintendent of the Quality Control Section Department of New Car Engineering, New York City Transit Authority, the defendant had the power to affect, or influence the company's interest in the delivery of the R–46 Pullman subway car to the City of New York.

"The Government need not show that the defendant in words or otherwise, induced, requested, demanded, or solicited the benefits from the companies involved.

"So long as the motivation for the bestowal of any of the benefits focused on Mr. O'Grady's office—that is, so long as the office or the fact of his official position, induced the payments—and so long as the defendant knew such was the case—then the conduct falls within the ambit of the Statute.

 \* \* \* \* \* \*

"If you find beyond a reasonable doubt that a company gave any benefit that it is alleged to have given in the indictment because the company reasonably believed that, in his official capacity, Mr. O'Grady had the power to take or withhold action that could hurt or benefit the company, or to affect or influence the inspection and delivery of the R–46 subway car, then you may find that the consent of the bestowing company was induced under color of official right, and if you further find beyond a reasonable doubt that the defendant knew that that [sic] the reason travel and entertainment benefits were given to him, then the second element is satisfied; but if either or both of these facts has not been so proven beyond a reasonable doubt, then it is not, and you must find for the defendant.

 \* \* \* \* \* \*

"Now, in determining whether the consent of the company or companies giving benefits to Mr. O'Grady was induced under color of official right, it is of course proper to rely on human experience.

"While the Government need not prove that the defendant promised something in return for the benefits—that is, while the Government need not allege or prove that there was, in fact, any quid pro quo, because, as I've indicated, the crime is complete if the public official accepts a benefit knowing it was given with a focus of his office—it is of course appropriate to consider whether any of the companies involved expected that, by bestowing benefits on the defendant, he would not exercise his power to the detriment of the company.

"Such an expectation, if proven, establishes that the company gave the benefits focused on the defendant's office." (T. 1781–88).

made clear that a public official can supply the required inducement if (1) he has the power to aid or injure the donor; (2) the donor makes the gift because of that power; and (3) the official knows that is the reason for the gift.

In my view Judge Platt's instruction properly sets forth the standard of proof required to establish the crime of "obtaining property with the donor's consent ... under color of official right." To require more of a showing of inducement, as the majority appears to do, unnecessarily weakens the statute as an instrument for combating corruption in the face of the proof problem presented by the subtlety and secrecy with which the participants in such misconduct act.

Proof problems aside, the majority opinion leaves in limbo the concept of "inducement" and "misuse" of office. The majority states, on the one hand, that the government "is not required to prove that the public official demanded or directly solicited the benefits received, or that he offered a specific *quid pro quo* in exchange for the benefits" (Maj.Op. 688–689, but, on the other hand, that the government must prove that "the public official misused his office to obtain the benefits" (Maj.Op. 689). The term "misuse of office," however, is never defined. Instead, we are given a 3-page list of garden-variety bribery cases (Maj.Op. 689–690) in which the public official either directly solicited the benefits or furnished a *quid pro quo* for them, or both. In other words, the only guidance we are given is an implicit suggestion that there should be a demand by the official or his furnishing of a *quid pro quo* for the benefits, even though the court expressly concedes that neither a demand nor a *quid pro quo* is an essential element of the crime (Maj.Op. 689).

In short, although the majority concludes that "there must also be proof that the public official did something, under color of his public office, to cause the giving of the benefits" (Maj.Op. 687) and "that wrongful use of public office involves some action by the public official to induce the benefits

given" (Maj.Op. 690), it never states what that "something" or that "action" must be. The public is entitled to a more definitive standard than the majority here provides for determining what constitutes wrongful use of public office inducing the bestowal of benefits upon the official "under color of official right."

Several other circuits, interpreting the Hobbs Act liberally as Congress intended, *see Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960) (the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence"), have required less to be shown than that prescribed by Judge Platt's charge. They hold it to be sufficient for the government to establish only that the government official accepted the money or benefits with knowledge that they were conferred because of his or her public office and that it is unnecessary for him to "take the initiative" or "induce payment" to violate the Act. *United States v. Jannotti,* 673 F.2d 578, 595 (3d Cir.) *(en banc), cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Hedman,* 630 F.2d 1184, 1195 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Butler,* 618 F.2d 411, 417–18 (6th Cir.), *cert. denied,* 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980). The Seventh Circuit, whose position was later adopted by the Third Circuit, summarized its view as follows:

"It is settled law in this Circuit as well as others that in a Hobbs Act prosecution for extortion under color of official right it is unnecessary to show that the defendant induced the extortionate payment or that the payor was entitled to the benefit obtained from such payment. *The government is merely required to prove that a public official obtained money to which he was not entitled and which he obtained only because of his official position." United States v.*

*Hedman, supra,* 630 F.2d at 1195. (Emphasis added, footnote omitted).

In *United States v. Jannotti, supra,* the Third Circuit observed:

"At common law, extortion was defined as 'any officer's unlawfully taking, by color of his office, from any man, any money or thing of value that is not due to him.' 4 W. Blackstone, *Commentaries* \*141. The requirement that the money be taken 'by color of his office' meant 'simply that the officer must have taken money not due him for the performance of his official duties.' ...

"The holding in our cases that the Hobbs Act covers the acceptance of bribes by public officials even when payment was not obtained by force, threats, or use of fear, and *the further suggestion that there need be no inducement or prior request for such payments, accords with the view taken by other courts of appeals.*" *United States v. Jannotti, supra,* 673 F.2d at 595 (emphasis added, citation omitted).

Indeed, in *United States v. Trotta,* 525 F.2d 1096, 1100 (2d Cir.1975), we quoted with approval the following from the Seventh Circuit's decision (per opinion of Supreme Court Justice Tom C. Clark, sitting by designation) in *United States v. Braasch,* 505 F.2d 139, 151 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975):

" 'The use of office to obtain payments is the crux of the statutory requirement of "under color of official right", and appellants' wrongful use of official power was obviously the basis for this extortion.... *It matters not whether the public official induced payments to perform his duties or not to perform his duties,* or even as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. *So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951.*' " (525 F.2d at 1100, emphasis added).

Although Judge Platt's charge does not go as far as the simple rule adopted by these other circuits and I am not urging the adoption of their rule by this court, the majority's attempt to distinguish these other cases on the ground that in those cases there was evidence "from which inducement can readily be inferred" (Maj.Op. 689) is unpersuasive. The same can be said of the present case where the majority concedes that O'Grady might "have been found guilty on the facts of this case if the jury had been properly charged" (Maj.Op. 692). If inducement clearly existed in those cases, no purpose would have been served by the flat, unequivocal and repeated pronouncements by these other circuits and even by ourselves to the effect that further proof of inducement is unnecessary as long as benefits were bestowed upon the official because of his public office. See *Jannotti, supra,* 673 F.2d at 595; *Hedman, supra,* 630 F.2d at 1195; *Butler, supra,* 618 F.2d at 417–18; *Braasch, supra,* 505 F.2d at 151. Had any of those courts construed the statute as it has been interpreted by the majority here they would have reversed and remanded for a new trial.

The plain fact, which cannot be escaped, is that these circuit court decisions are in direct conflict with the majority opinion in this case. That fact is not changed by the majority opinion's string-cite of numerous cases in which there were express affirmative inducements in the forms of demands, furnishing of *quid pro quo,* or the like, on the part of the official (Maj.Op. 689–690). O'Grady's conduct does not become any less a violation of the Hobbs Act because there have been other cases in which officials behaved in an even more outrageous manner.

O'Grady's contention that Hobbs Act extortion under color of official right must be construed as narrowly as "extortion" under the New York Penal Code, *see People v. Dioguardi,* 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960) (bribery and extortion are mutually exclusive under New York law); *People v. Feld,* 262 A.D. 909, 28 N.Y.S.2d 796 (2d Dept.1941) (same), was

vigorously advanced by Judge Aldisert of the Third Circuit, dissenting in *United States v. Cerilli*, 603 F.2d 415, 426 (3d Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), but has not gained acceptance by any circuit, including his own. *See United States v. Harding*, 563 F.2d 299, 304–05 (6th Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). The preferable view, adopted by several circuits, is that bribery and extortion are not mutually exclusive and that extortion as defined in the Hobbs Act "could include such activity as is commonly considered to be bribery." *United States v. Harding, supra*, 563 F.2d at 305; *see United States v. Brown*, 540 F.2d 364, 372 (8th Cir.1976); *United States v. Hall*, 536 F.2d 313, 321 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Hathaway*, 534 F.2d 386, 394 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). As we have emphasized and other circuits have noted, *see, e.g., Jannotti, supra*, 673 F.2d at 594–95, Hobbs Act extortion under color of official right is basically equivalent to the common law crime of extortion by officials, *Trotta, supra*, 525 F.2d at 1100. "At common law a public official who under color of office obtained the property of another not due either to his office or the official was guilty of extortion," *United States v. Nardello*, 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969). The crime was the official's taking of money not due him. No proof of use of force, solicitation, inducement, or duress on the part of the official was required. See Ruff, *Federal Prosecution of Local Corruption: A Case Study*

*In The Making of Law Enforcement Policy*, 65 Geo.L.J. 1171, 1179 (1977).[4]

Equally unpersuasive is the majority's effort to support its narrow interpretation of the "official right" provision of the Hobbs Act, which was enacted July 3, 1964, Pub.L. No. 79–486, 60 Stat. 420, on the ground that Congress would not later in 1962 have enacted 18 U.S.C. § 201(g), which prohibits receipt of gratuities by federal officials, if it believed that such payments were already prohibited by the Hobbs Act (Maj.Op. 691). In the first place, § 201 is merely a successor to earlier provisions of the Criminal Code that were enacted in the nineteenth century and existed long before the Hobbs Act was adopted. Thus § 201(g) is but part of Congress' "substitution of a single comprehensive section of the Criminal Code for a number of existing statutes concerned with bribery ... [which] would make no significant changes of substance and, more particularly, would not restrict the broad scope of the present bribery statutes as construed by the courts." S.Rep. No. 2213, 87th Cong., 2d Sess. 2, *reprinted in* 1962 U.S. Code Cong. & Ad.News, 3852, 3853. Secondly, the mere existence of partially overlapping federal criminal statutes prescribing differing penalties has never been accepted as a basis for judicial rejection of a prosecution under one rather than the other (except when the government seeks to enforce both to punish one offense, in which event one of the two must be dismissed on double jeopardy grounds, *see generally Albernaz v. United States*, 450 U.S. 333, 336–39, 101 S.Ct. 1137, 1140–42,

---

4. While there are indications from the congressional debates regarding other portions of the Hobbs Act that the New York law of extortion was considered with respect to the legality of certain labor union activities, see *United States v. Enmons*, 410 U.S. 396, 406 n. 16, 93 S.Ct. 1007, 1013 n. 16, 35 L.Ed.2d 379 (1973), I find no congressional mandate to incorporate the New York law of extortion into the Hobbs Act. As the *Harding* court noted, many states besides New York had statutes barring extortion "under color of official right" at the time Congress passed the Hobbs Act, *see Harding, supra*, 563

F.2d at 304–05, suggesting that Congress intended to refer not only to the law of New York State on extortion but to the common law and that of other states as well. *Id.* at 304. In the absence of some indication that Congress intended to shackle the broad language of the Hobbs Act with the particular restrictions existing in a single state's law, the Act should not be read so narrowly. It is relevant in that regard that New York itself repealed its narrow interpretation by statute in 1965. *See* N.Y.Penal Law §§ 135.70, 155.10, 180.30, 200.15.

67 L.Ed.2d 275 (1981); that situation, of course, does not exist here).

Indeed, the courts have repeatedly recognized that the Hobbs Act overlaps with a number of state and federal criminal statutes, but have refused to restrict its scope on that ground. *See United States v. Culbert*, 435 U.S. 371, 379, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978) (Congress was aware that "the conduct punishable under the Hobbs Act was already punishable under state robbery and extortion statutes"); *United States v. LaBinia*, 614 F.2d 1207, 1209 (9th Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980) ("overlapping coverage" of Hobbs Act and later-enacted federal Bank Robbery Act does not preclude prosecution under the former); *United States v. Cerilli, supra, United States v. Cerilli, supra*, 603 F.2d at 420–21 (same for overlap between Hobbs Act and 18 U.S.C. § 601). Such partial duplication is but the inevitable product of piece-meal additions to the Code over the last 150 years and constitutes one of the reasons behind proposed legislation designed to simplify and unify the Code.

Nor does the Hobbs Act's provision for heavier maximum penalties (up to 20 years imprisonment and a $10,000 fine) than § 201(g) (up to 2 years imprisonment and a $10,000 fine) provide a ground for the majority's narrow interpretation of the former. The larger maximum penalties of the Hobbs Act were designed to permit imposition of appropriately severe sentences in cases involving violence or threats of violence, which are not within the range of conduct prohibited by § 201(g), and not to preclude prosecution of official corruption under the former's "color of official right" provision.

In sum, although the court's present decision directly conflicts with *Jannotti, Hedman, Butler, Harding*, and *Brown, supra*, and our own quotation with approval in *Trotta, supra*, of the Seventh Circuit's decision in *Braasch*, I do not believe that it is necessary for us to construe the "official right" section of the Hobbs Act as broadly as those courts have in order to affirm the conviction in the present case. In my view the minimum standard for convicting an official of "obtaining ... property from another, with his consent ... under color of official right" in violation of the Hobbs Act is proof beyond a reasonable doubt that (1) he received property that may reasonably be perceived as likely to influence his exercise of his official duties, (2) the donor made the gift because of the official's power to take or withhold action that could harm or benefit him or a party for whom the donor acted, and (3) the official was aware of the donor's motive for the gift. This standard is a fair one. It requires proof of far more than mere receipt of picayune benefits, which might be innocent. It accords with the common law concept of extortion and with Congress' purpose in enacting the Hobbs Act, which was to deter corruption of public officials in the exercise of their duties. Being specific, this standard avoids the pitfalls associated with such vague general terms as "wrongful use of official power" or "inducement." At the same time it does not pose the barrier of requiring an express affirmative word or act of solicitation or use of threats or force by the official, which, of course, would clearly constitute extortion but would be impossible to prove in instances of subtle official corruption against which the Hobbs Act is aimed. This proposed construction of the statute, moreover, by providing "a reasonable person" standard for determining whether the benefits paid to the official are sufficiently sizeable to be extortionary in nature, avoids the conflicts and inconsistencies that could occur if the question were left to the official's subjective belief. In the present case, for instance, O'Grady, when asked under oath whether he thought it "proper to accept gratuities from people that you're doing business with?" testified unqualifiedly "I don't think anything is wrong with it." Although he viewed a payment of $500 as a bribe he was unwilling to say that it would have been improper to accept a gift of a Cadillac or Toyota from such persons (T. 1522–23). Such a warped perspective

would be no defense under the objective standard proposed here.

For all of the foregoing reasons I would affirm the judgment convicting the defendant of violating the Hobbs Act.[5]

**5.** Since the unpublished panel decision is vacated and this dissent supersedes our panel opinion, no purpose is served by publishing the latter.