UNITED STATES of America, Appellee,

v.

Paul CAMPO, Defendant-Appellant.

No. 1155, Docket 85–1096.

United States Court of Appeals,
Second Circuit.

Argued June 10, 1985.

Decided Oct. 4, 1985.

Mark P. Hutchison, Elmira, N.Y., for defendant-appellant.

Jonathan W. Feldman, Asst. U.S. Atty., W.D.N.Y., Rochester, N.Y. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Buffalo, N.Y., of counsel), for appellee.

Before LUMBARD, MANSFIELD and WINTER, Circuit Judges.

Arthur J. Viviani, Higgins & Viviani, New York City, for defendant-appellant.

Martin J. Auerbach, Asst. U.S. Atty., Southern Dist. of New York, New York City (Rudolph W. Giuliani, U.S. Atty. for the Southern Dist. of New York, Stuart E. Abrams, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, OAKES and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Paul Campo appeals from a judgment of conviction entered on March 12, 1985, 605 F.Supp. 886, following a jury trial before Judge Haight in the Southern District of New York. In this, his second trial, Campo was convicted on two counts of extorting and conspiring to extort "under color of official right" in violation of the Hobbs Act, 18 U.S.C. §§ 1951, 1952 (1982).[1] Campo does not dispute his receipt of improper payments while a New York City policeman. Rather, he claims there was insufficient evidence to prove that he induced the payments, and thus misused his official office. Because we find that there was sufficient evidence that Campo made a "request, demand, or solicitation" for the payments in his capacity as a police officer, we affirm.

## BACKGROUND

Campo was a patrolman in the New York City Police Department's Tenth Precinct, in the Chelsea section of Manhattan's West Side. He and his partner Raphael Commisso were permanently assigned to patrol sector "A" of the precinct between September, 1979, and October, 1981. They also worked intermittently with other patrolmen or in other sectors.

The Funhouse Disco opened in early 1979 at 526 West 26th Street, in sector "D" of the Tenth Precinct. Catering to a young crowd, the disco was open for business two nights a week, on Saturday mornings until about 6 a.m. and on Sunday mornings until about 8 a.m. The Funhouse attracted large and often unruly crowds, and the disco employed a number of "bouncers," headed by a man named Angelo. In addition, a number of assaults occurred in the vicinity, and many cars parked illegally near the disco.

According to the testimony of Patrolman Thomas Peteroy, in May or June of 1979 Angelo entered into a "contract" with two Tenth Precinct patrolmen. The contract provided that the police assigned to sector "D" would remain in front of the disco as much as possible on weekend nights, and in return would receive $50 a night. Pursuant to the contract, Angelo regularly paid the two policemen assigned to the sector to park in front of the Funhouse, to ticket the double-parked cars, and to keep watch on the vandalism and unruliness that accompanied the late-night revelry. Angelo regularly delivered $50 cash, later raised to $75 for the Saturday-Sunday shift, to the two officers before they went off duty at 8 a.m.

During the course of the contract, Officer Peteroy was regularly assigned to sector "D" on weekend nights. Peteroy testified that on these nights he parked his radio car in front of the Funhouse, left the disco only when ordered to other duty by a radio call, and returned to the disco upon completion of the call. As a result, he failed in his duty to patrol the entire sector. Between fifteen and twenty officers shared at least one such shift with Peteroy. He testified that he split the night's payments with each of those officers, except for three he didn't trust. Commisso rode with Peteroy and split the payments on five to ten occasions. Campo never rode with Peteroy during the course of the contract. Campo did, however, patrol sector "D" on about eleven weekend nights with his regular partner Commisso.

---

1. The Hobbs Act provides, in relevant part, that:
   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

   (b) As used in this section—
   . . . .
   (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
   18 U.S.C. § 1951 (1982).

In 1979 Campo and Commisso asked Peteroy if they could have the "D" sector on an upcoming weekend night. Before the shift began, the two officers heard that Angelo wanted to talk with policemen assigned to the sector. When the officers went to 26th Street that night, Angelo waved them over. He told them he would appreciate their giving the block as much attention as they could because of recurring fights and double parking. Commisso testified that he answered: "[W]e would certainly patrol the street as much as we could, but we also had other duties to perform. We had to take care of the rest of our sector and we had to answer our jobs." The street was busy that night, and Commisso and Campo spent quite a bit of time there. Toward the end of the shift, shortly before 8 a.m., Angelo once again waved the police car over. He thanked the officers for being around and dropped $50 through the window of the car. Commisso testified that the officers were surprised and that he thought that it was "a lot of money." After discussing whether to keep the money, the two decided to split it.

After this incident, Commisso and Campo worked the same shift about ten more times, with a total take of no more than $250 each. The officers habitually spent a large portion of such shifts near the Funhouse, and Commisso testified that they anticipated getting paid by Angelo. Near the end of each tour, they would return to the Funhouse as the disco was closing up. Angelo would pay them at that time.

On one night, other work kept the officers away from 26th Street, and Angelo declined to pay them when they came by in the early morning. Angelo resumed payment on subsequent occasions when the officers had been visible outside the disco.

Peteroy further testified that Commisso and Campo discussed with him the fact that the Funhouse was staying open very late into Sunday morning. Thereafter, Peteroy talked with the officers who had originally set up the contract, and the payoff was soon raised to $75 for the Saturday-Sunday shift.

Campo was convicted on both counts of the indictment on September 19, 1983. That conviction was reversed and remanded by this court in light of the *en banc* decision in *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984). *United States v. Campo*, 744 F.2d 944, 945 (2d Cir.1984) (*per curiam*). Campo's retrial commenced on January 14, 1985, and concluded two days later, when the jury once again returned guilty verdicts on both counts. On March 12, 1985, Judge Haight sentenced Campo to 300 hours community service, and also to two years' probation on each count, to run concurrently.

## DISCUSSION

We recently examined *en banc* the definition of extortion under the Hobbs Act, 18 U.S.C. § 1951 (1982). *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984). One element of the crime, receipt of benefits in one's capacity as a public official, *id.* at 687, is not contested by Campo. Also necessary for conviction, however, is proof that the public official induced the payments. The government therefore must offer evidence sufficient to allow "the jury to find that the public official did something, under color of his office, to cause the giving of benefits," *id.* at 693, i.e., some misuse of office to obtain benefits, *id.* at 692–93. Campo claims that the government failed to produce such evidence. We disagree.

In *O'Grady*, we reversed because of a jury charge that equated the mere acceptance of benefits by a public official with wrongful use of public office. *See id.* at 688. We recognized, however, that inducement can take subtle forms: "Proof of a request, demand or solicitation, no matter how subtle, will establish wrongful use of public office; proof of a *quid pro quo* would suffice as would other circumstantial evidence tending to show that the public official induced the benefits." *Id.* at 691–92. A separate opinion, joined by eight of the thirteen participating judges, held that "the jury should be permitted to infer inducement by the defendant based upon a finding of repeated acceptances

over a period of time of substantial benefits (i.e., benefits of a nature and magnitude which reasonably could affect public official's exercise of his or her duties)." *Id.* at 694 (Pierce, J., concurring); *accord id.* (Newman, J., concurring).

Because Campo's conduct went well beyond mere acceptance of benefits, we need not decide whether the payoffs, less than $250 spread over a 25 month period, were "substantial" i.e. of a nature and magnitude that reasonably could affect the exercise of his duties. In fact, Campo repeatedly took specific action that had as its goal the receipt of payoffs. Specifically, Commisso and Campo returned to the Funhouse at the end of their shifts when the disco was closing up. There was sufficient evidence for the jury to find that the sole purpose of returning was to get the money from Angelo. This repeated, deliberate seeking of payment constitutes "a request, demand or solicitation," *id.* at 691, well beyond the mere acceptance of benefits, and is more than sufficient to prove that Campo induced the payments. Moreover, Commisso and Campo knew from the occasion on which Angelo refused to pay them that they would be paid at the end of the shift only if they had spent sufficient time on 26th Street. This understanding is in the nature of a *quid pro quo* and is also sufficient to prove inducement. *Id.* at 691–92.

Affirmed.

OAKES, Circuit Judge (dissenting):

In this case, which in view of the amount involved and the limited effect on interstate commerce hardly seems to be a proper candidate for the exercise of federal court jurisdiction, I am required to dissent. I do not believe that any of the tests for proving inducement set forth in *O'Grady* was met. *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984). Campo's receipt of, at most, ten payments, $25 each in amount, spread over a one-year period did not justify "a finding of repeated acceptances over a period of time of substantial benefits (i.e., benefits of a nature and magnitude which reasonably could affect a public official's exercise of his or her duties)." *Id.* at 694

(Pierce, J., concurring). If the payments accepted by Campo were deemed "substantial," any public employee who periodically accepts relatively small gratuities—e.g., a mailman at Christmas—will be exposed to the heavy penal sanctions of the Hobbs Act, even in the absence of any proof that those gratuities were solicited in any fashion or that they affected the official's behavior. While other penalties may be appropriate, clearly the Hobbs Act was not meant to cover such de minimis violations.

In the absence of receipt of substantial benefits, the critical question under *O'Grady* is whether there was a quid pro quo furnished, *see O'Grady*, 742 F.2d at 691–93, and I do not see how such can legitimately be inferred. In this case, there is no evidence that indicates, "that those who gave, profited, and those who did not, lost." *Id.* at 692. There is instead evidence, including Campo's testimony, that indicates that the payments did not lead the officer to patrol his sectors in a way that either aided the disco or harmed the rest of the sectors through neglect. Duty required that the street, which was one of the two areas in the sector that were very busy after midnight, be regularly patrolled and carefully monitored. Campo and his partner continued to patrol the rest of their sectors. They never parked on the street on which the disco was located. They stopped on the street only to conduct police business, such as to ticket illegally parked cars (except, to be sure, to receive their nightly payments). The officers continued to patrol the street after they stopped accepting those payments. According to Campo's partner, neither he nor Campo asked for, demanded, or requested a payment from Angelo.

The only evidence that suggests the existence of a quid pro quo is that Angelo refused to pay the officers on a night on which they had not spent enough time on the street to satisfy him. That action, however, must be set in the broader context of a situation in which there was no evidence that Campo "asked for or demanded benefits, that he offered *quid pro quo* in exchange for benefits, that he forestalled official action in anticipation of receiving ben-

efits, or that he misused his public office in any way." *Id.* at 692. In that context, Angelo's actions look more like (perhaps illegal) gratuities than extorted payments. Angelo rewarded the police officers when their compliance with their official duties led them to act in a way that benefited him; when their compliance with their duties did not benefit him, he did not reward them. All that the evidence in this case proves, then, is that Campo received money with the knowledge that "his office was the motivation behind the giving of the benefits," *id.* at 687, and, as we held in *O'Grady*, that does not constitute a violation of the Hobbs Act, *see id.* There was in short insufficient evidence to justify conviction for wrongful use of the power of office to induce payment or to cause benefit to the payor. *See id.* at 689, 691–92.